WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Teresa Lyn Remmers,

Plaintiff,

v.

Carolyn W. Colvin,
Acting Commissioner of Social Security,

Defendant.

No. CV-14-01028-PHX-JAT

**ORDER**

Pending before the Court is Plaintiff Teresa Lyn Remmers' appeal from the Social Security Commissioner's denial of her application for disability insurance benefits and supplemental security income under the Social Security Act. Plaintiff argues that the administrative law judge ("ALJ") erred by determining that Plaintiff was not credible, by inadequately explaining her residual functional capacity ("RFC") assessment, and by failing to support her finding that Plaintiff could perform a significant number of jobs existing in the national economy. The Court now rules on Plaintiff's appeal.

## I. Background

### A. Procedural Background

On May 21, 2010, Plaintiff filed an application for disability insurance benefits and supplemental security income, alleging that she suffered from panic and anxiety

1    attacks and had been unable to work since April 1, 2010. (Tr. 33).[1] Plaintiff's claims were

2    initially denied on October 22, 2010, and upon reconsideration on March 7, 2011. (*Id.*)

3    Thereafter, Plaintiff timely requested a hearing, which was conducted by ALJ Joan G.

4    Knight on June 20, 2012 in Phoenix, Arizona. (*Id.*) On December 13, 2012, the ALJ

5    issued an unfavorable decision. (*Id.*) After Plaintiff's request for review by the Social

6    Security Administration Appeals Council was denied on March 4, 2014, she commenced

7    this action in federal court on May 13, 2014. (Doc. 1).

8        **B.    Plaintiff's Background**

9        Plaintiff was born on November 1, 1960 and lives with her husband and their two

10   dogs. (Tr. 52, 62, 229–30). Plaintiff completed nineteen years of education (Doc. 3 at 4),

11   earned bachelor's degrees in Biochemistry and Medical Technology with a minor in

12   Physics (Tr. 53), took course work towards a master's degree (Tr. 57),[2] and self-reports

13   fluency in both English and German (Tr. 343). Plaintiff also spent a considerable amount

14   of time in vocational training throughout her professional career. (Tr. 53, 57). Plaintiff

15   worked the majority of her adult life and by all appearances was a self-reliant, competent

16   employee who "built [her] own cliental" and once earned over $52,000 in a year. (Tr. 59,

17   215). Currently, Plaintiff's primary source of income comes from monthly

18   unemployment benefits. (Tr. 216–17). She does drink alcohol[3] and smokes cigarettes.

19   (Tr. 291, 307, 343).

20   _____

21       [1] Citations to "Tr." are to the certified administrative transcript of record.
     (Docs. 14, 15).
22       [2] During Plaintiff's evaluation with the Arizona Department of Economic Security
     in September of 2010, she stated that she had earned a bachelor's degree in computer
23   engineering, a master's degree in electrical engineering, and had worked as a computer-
     networking expert. (Tr. 306). During a psychiatric evaluation in August of 2010, Plaintiff
24   stated that she completed a master's degree in biochemistry. (Tr. 313).
25       [3] As the ALJ observed, the frequency of Plaintiff's alcohol consumption is
     unclear. Since the date of her alleged disability, Plaintiff has reported that she drinks the
26   following amounts: 1) "4 vodkas per day" (Tr. 372); 2) "drinks daily" (Tr. 291); 3)
     "drinks socially" (Tr. 394); 4) a glass of wine four to five times per week (Tr. 343); and
27   5) three glasses of wine per month (Tr. 67). Further, on April 21, 2011, Plaintiff
     presented to her treating physician "smell[ing] of ETOH." (Tr. 372).
28

On June 20, 2012, Plaintiff appeared before the ALJ regarding her alleged disability of anxiety, depression, and panic attacks. (Tr. 50–75). Plaintiff testified that she takes two prescription medications, Xanax and Paxil, to alleviate the symptoms of her anxiety. (Tr. 64). She further stated that she has taken Paxil for three years. (*Id.*) Plaintiff attested, however, that Xanax sometimes makes her feel "goofy" and Paxil occasionally gives her a "tingling" sensation. (Tr. 64, 69). Due to these side effects, Plaintiff noted that her doctor is shifting her from Paxil to Lintemint. (*Id.*)

Plaintiff also testified that she has difficulty sleeping and is "scared to sleep." (Tr. 62). Nonetheless, Plaintiff explained that after a panic attack she gets "four solid hours of good hard sleep[,] . . . wake[s] up[,] . . . eat[s,] then go[es] back to sleep maybe for another hour or so." (*Id.*) Previously, Plaintiff told evaluating physician Marcel Van Eerd, Ph.D., that she sleeps at least five straight hours per night, wakes up, sleeps more in the early morning, and then naps throughout the day. (Tr. 343). As for her daily routine, Plaintiff "wake[s] up in the morning" before her husband, cooks simple meals, washes the dishes, feeds and walks her two dogs, showers, dresses herself, watches television, and completes crosswords. (Tr. 62–63, 342). Plaintiff can also manage her own medications and hygiene, use the computer, pay bills, make telephone calls, do laundry, and read. (Tr. 342). As for her public endeavors, Plaintiff visits her husband's parents three times per week (Tr. 83, 332), goes on mall outings (Tr. 406), uses public transportation to run errands (Tr. 67), rides bicycles (Tr. 376), shops (Tr. 342), and attends church regularly (Tr. 322).

## C.    Medical Background

Plaintiff claims that anxiety and panic attacks have plagued her since she was a child but only became disabling on April 1, 2010. (Tr. 63). As her method of managing these issues in the past, Plaintiff explains that she "isolated" herself. (*Id.*) This isolation is apparently why Plaintiff married "later in life,"[4] never had children, does not have

---

[4] Plaintiff also testified that she was married "in Indiana" at some point, which clarifies why her last name is "Dolezal" on the majority of her medical records from 2010

friends, keeps her family distant, and worked as a salesperson. (*Id.*) Plaintiff, however, never sought clinical assistance until months after her alleged disability onset date. *See* (Tr. 364).

Two and a half months after Plaintiff filed her application for benefits with the Social Security Administration, she contacted Jewish Family and Children Services ("JFCS") for intake and evaluation. (*Id.*) Based on a preliminary psychiatric evaluation on August 10, 2010, the clinician observed that Plaintiff "[d]ressed appropriately"; was "casually groomed"; had an "anxious" mood; maintained "good" eye contact; had "good" memory, insight, and judgment; made "logical" associations; and presented with "no mannerisms of note." (Tr. 314). After this initial evaluation, Plaintiff "no show[ed]" to subsequent appointments. (Tr. 316, 370). JFCS attempted to contact Plaintiff numerous times, but Plaintiff never responded. (Tr. 366–69). On December 9, 2010, without ever attending a clinical treatment session, Plaintiff was discharged for "lack of contact." (Tr. 364).

Nearly a year after Plaintiff's discharge from JFCS and eighteen months after Plaintiff filed her application with the Social Security Administration, Plaintiff presented to Marley House Behavioral Health ("Marley House"). (Tr. 404). Plaintiff attended six of her first eight weekly appointments. (Tr. 404–06). At these appointments, Plaintiff "appeared anxious" and used "rapid speech" but was "engaged." (*Id.*) The clinician also noted that Plaintiff learned coping mechanisms and breathing techniques. (*Id.*) After this initial period, however, Plaintiff cancelled or failed to show up to eight of the next ten appointments. (Tr. 406–11). On March 19, 2012, Marley House advised Plaintiff that if she did not provide twenty-four hour notice before her next cancellation her file would be closed. (Tr. 410). One week later, Marley House closed Plaintiff's file after she failed to

to 2012. *See* (Tr. 66, 289–303, 313–40, 364–96, 404–11). Plaintiff explains that her "last name at that time of my marriage" was Remmers, but due to the Indiana "courthouse burn[ing] down," she could not obtain the divorce decree to change her legal last name to Remmers. (*Id.*) Interestingly, Plaintiff's current husband, John R. Tilton, wrote in July of 2010 that he and Plaintiff had been "married for 11 years." (Tr. 236). Exactly when, where, and to whom Plaintiff has been legally married is unknown.

show up to her appointment and did not provide the necessary notice. (Tr. 411).

No Appointment, M.D. ("No Appointment") appears to be Plaintiff's primary care facility. Since the onset of her alleged disability, Plaintiff received treatment from No Appointment several times for a variety of issues. For example, on July 26, 2011, Plaintiff was treated for a knee injury she suffered when she fell off her bicycle (Tr. 376–77), and on November 5, 2011, Plaintiff was treated for a right arm injury resulting from a fall at a dog park (Tr. 384–85). Plaintiff's anxiety is reported in four No Appointment records. On April 21, 2011, a No Appointment clinician noted that Plaintiff "would like Xanax" for her panic attacks. (Tr. 372). At this same appointment, Plaintiff "smell[ed] of ETOH" and reported that she "drinks 4 vodkas a day." (*Id.*) On June 25, 2011 and January 3, 2012, the clinical impression of Plaintiff noted panic and anxiety. (Tr. 375, 386). Finally, at a February 1, 2012 appointment, the clinician noted that Plaintiff "misplaced [her] Xanax" and was going through "4 days of anxiety." (Tr. 390). The clinician also wrote that Plaintiff and her husband were experiencing a foreclosure and decreasing income. (*Id.*) Ultimately, the clinician prescribed Effexor, although Plaintiff never filled the prescription. (Tr. 391–92).

## II.   Legal Standard

The ALJ's decision to deny benefits will be overturned "only if it is not supported by substantial evidence or is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (quotation omitted). "Substantial evidence" means more than a mere scintilla, but less than a preponderance. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).

"The inquiry here is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citation omitted). In determining whether there is substantial evidence to support a decision, the Court considers the record as a whole, weighing both the evidence that supports the ALJ's conclusions and the evidence that detracts from the ALJ's conclusions. *Reddick*, 157 F.3d at 720. "Where evidence is

susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld; and in reaching his findings, the ALJ is entitled to draw inferences logically flowing from the evidence." *Gallant*, 753 F.2d at 1453 (citations omitted); *see Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). This is because "[t]he trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *see Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990).

The ALJ is responsible for resolving conflicts in medical testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Thus, if on the whole record before the Court, substantial evidence supports the Commissioner's decision, the Court must affirm it. *See Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989); *see also* 42 U.S.C. § 405(g). On the other hand, the Court "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quotation omitted).

Notably, the Court is not charged with reviewing the evidence and making its own judgment as to whether Plaintiff is or is not disabled. Rather, the Court's inquiry is constrained to the reasons asserted by the ALJ and the evidence relied upon in support of those reasons. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

## A.    Definition of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show that, among other things, she is "under a disability." 42 U.S.C. § 423(a)(1)(E). The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person is:

> under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. § 423(d)(2)(A).

### B.      Five-Step Evaluation Process

The Social Security regulations set forth a five-step sequential process for evaluating disability claims. 20 C.F.R. § 404.1520(a)(4); *see also Reddick*, 157 F.3d at 721. A finding of "not disabled" at any step in the sequential process will end the inquiry. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at the final step. *Reddick*, 157 F.3d at 721. The five steps are as follows:

1. First, the ALJ determines whether the claimant is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled.

2. If the claimant is not gainfully employed, the ALJ next determines whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). To be considered severe, the impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities are the "abilities and aptitudes to do most jobs," such as lifting, carrying, reaching, understanding, carrying out and remembering simple instructions, responding appropriately to co-workers, and dealing with changes in routine. 20 C.F.R. § 404.1521(b). Further, the impairment must either have lasted for "a continuous period of at least twelve months," be expected to last for such a period, or be expected "to result in death." 20 C.F.R. § 404.1509 (incorporated by reference in 20 C.F.R. § 404.1520(a)(4)(ii)). The "step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). If the claimant does not have a severe impairment, then the claimant is not disabled.

3. Having found a severe impairment, the ALJ next determines whether the impairment "meets or equals" one of the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is found disabled without further inquiry. If not,

before proceeding to the next step, the ALJ will make a finding regarding the claimant's "residual functional capacity based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). A claimant's "residual functional capacity" is the most he can still do despite all his impairments, including those that are not severe, and any related symptoms. 20 C.F.R. § 404.1545(a)(1).

4. At step four, the ALJ determines whether, despite the impairments, the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). To make this determination, the ALJ compares its "residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. § 404.1520(f). If the claimant can still perform the kind of work he previously did, the claimant is not disabled. Otherwise, the ALJ proceeds to the final step.

5. At the final step, the ALJ determines whether the claimant "can make an adjustment to other work" that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In making this determination, the ALJ considers the claimant's "residual functional capacity" and his "age, education, and work experience." 20 C.F.R. § 404.1520(g)(1). If the claimant can perform other work, he is not disabled. If the claimant cannot perform other work, he will be found disabled.

In evaluating the claimant's disability under this five-step process, the ALJ must consider all evidence in the case record. *See* 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1520b. This includes medical opinions, records, self-reported symptoms, and third-party reporting. *See* 20 C.F.R. § 404.1527; 20 C.F.R. § 404.1529; SSR 06–3p, 71 Fed. Reg. 45593-03.

### C.     The ALJ's Evaluation under the Five-Step Process

In step one of the sequential evaluation process the ALJ found that Plaintiff did not engage in substantial gainful activity since her alleged onset date of April 1, 2010. (Tr. 36). At step two, the ALJ concluded that Plaintiff had the following medically determinable impairments: "panic disorder without agoraphobia; and depressive disorder, not otherwise specified." (*Id.*) The ALJ deemed these impairments "severe" because they

had caused and would continue to cause more than minimal work-related functional limitations. (*Id.*) Under step three, the ALJ determined that Plaintiff's mental impairments did not meet or equal any of the listed impairments in the Social Security regulations. (*Id.*)

Before moving on to step four, the ALJ conducted an RFC determination in light of Plaintiff's testimony and objective medical evidence. (Tr. 38). The ALJ found that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: [Plaintiff] can perform the mental demands of simple work." (*Id.*) At step four, the ALJ found that Plaintiff could not perform her past work. (Tr. 41). Finally, the ALJ concluded at step five that based on Plaintiff's RFC, age, education, and work experience, Plaintiff could perform significant numbers of jobs existing in the national economy. (Tr. 42). Consequently, the ALJ found that Plaintiff was not disabled under the Social Security Act. (Tr. 43).

**III.   Analysis**

Plaintiff makes three arguments for why the Court should set aside the ALJ's decision. Specifically, Plaintiff asserts that the ALJ committed the following errors: 1) rejecting Plaintiff's symptom testimony without clear and convincing reasons for doing so, 2) assigning Plaintiff an RFC with a mental limitation of "simple work," and 3) failing to consult a vocational expert ("VE") to determine the vocational impact of Plaintiff's mental impairments and failing to adequately support her finding that Plaintiff can perform work existing in significant numbers in the national economy. (Doc. 19). The Court will now address each argument in turn.

### A.   Whether the ALJ Properly Discredited Plaintiff's Testimony

The Court first turns to Plaintiff's argument that the ALJ erred when she determined that Plaintiff's symptom testimony was "not fully credible."

#### 1.   Legal Standard

An ALJ must engage in a two-step analysis to determine whether a claimant's testimony regarding subjective symptoms is credible. *Molina v. Astrue*, 674 F.3d 1104,

1112 (9th Cir. 2012). First, as a threshold matter, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if the claimant meets the first test, then "the ALJ 'may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.'" *Orteza v. Shalala*, 50 F.3d 748, 749–750 (9th Cir. 1995) (quoting *Bunnell*, 947 F.2d at 346–47). Rather, "unless an ALJ makes a finding of malingering based on affirmative evidence thereof," the ALJ may only find the claimant not credible by making specific findings supported by the record that provide clear and convincing reasons to explain her credibility evaluation. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (citing *Smolen*, 80 F.3d at 1283–84); *see Lingenfelter*, 504 F.3d at 1036.

### 2.   Analysis

In this case, the ALJ determined that Plaintiff satisfied the first step because Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 39). After apparently finding no affirmative evidence of malingering, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the ["simple work"] residual functional capacity assessment." (*Id.*)

Plaintiff argues that the ALJ failed to properly weigh her subjective complaints because the ALJ did not give clear and convincing reasons for rejecting her testimony. (Doc. 19 at 7). Specifically, Plaintiff claims that the ALJ erred by "repeatedly impugning" Plaintiff for failing to seek treatment, follow up with treatment, and comply with prescribed treatment. (*Id.* at 8). Plaintiff also asserts that the ALJ erred by discrediting Plaintiff's testimony because Plaintiff was "more active than one would expect for an individual who is precluded from all work as a result of mental impairments." (*Id.*) The Court will analyze each argument in turn.

a.   **Plaintiff's Delay in Seeking Treatment, Failure to Attend Treatment Appointments, and Failure to Comply with Treatment Advice**

As one factor for discrediting Plaintiff's testimony, the ALJ noted that despite Plaintiff's alleged disability onset date of April 1, 2010, Plaintiff did not seek clinical treatment for nearly four months. (Tr. 40). Additionally, the ALJ observed that Plaintiff repeatedly failed to comply with treatment advice or attend treatment appointments. (*Id.*) For example, Plaintiff only attended the intake and psychiatric evaluation at JFCS, "no show[ed]" to subsequent appointments, and did not respond to JFCS's phone calls. (Tr. 316, 366–70).[5] Likewise, after an initial period of attending six of eight sessions, Plaintiff cancelled or failed to show up to eight of ten appointments at Marley House, leading to her discharge. (Tr. 406–11). To explain her failure to attend clinical appointments, Plaintiff testified that she was unable to "get out of the house" because she "couldn't move" due to anxiety and panic attacks. (Tr. 65).

The Ninth Circuit has long held that "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" is a relevant factor in assessing credibility of a claimant's testimony. *Bunnell*, 947 F.2d at 346; *see Meanal v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (noting that an ALJ may consider claimant's failure to follow treatment advice as a factor in assessing claimant's credibility). Similarly, the Social Security Rulings ("SSR") express that an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p, 1996 WL 374186 (July 2, 1996).[6]

---

[5] Notably, after only attending the initial intake and psychiatric evaluation at JFCS, Plaintiff did not seek clinical treatment again until November 2011—over a year and a half after she allegedly became disabled. (Tr. 404).

[6] SSRs "do not carry the 'force of law,' but they are binding on ALJs nonetheless." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009). The Rulings "'reflect the official interpretation of the [Social Security Administration]

Although the Court agrees with Plaintiff that it would be problematic to chastise a claimant with a "mental impairment for the exercise of poor judgment in seeking rehabilitation," *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–300 (9th Cir. 1999) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)), in this case, "there was no medical evidence that [Plaintiff's] resistance [to] treatment was attributable to her mental impairment rather than her own personal preference, and it was reasonable for the ALJ to conclude that the 'level or frequency of treatment was inconsistent with the level of complaints,'" *Molina*, 674 F.3d at 1114 (quoting SSR 96-7p). Contrary to Plaintiff's argument, the record evidence indicates that Plaintiff has "good" judgment, insight, and knowledge (Tr. 314) and "very good" intellectual functioning and general memory (Tr. 344). Further, despite Plaintiff's claim that she "could [not] get out of the house," the ALJ repeatedly noted that Plaintiff engaged in numerous public activities, including: 1) walking her dogs, 2) using public transportation to run errands, 3) attending church regularly, 4) grocery shopping, 5) taking her dogs to the dog park, 6) riding her bicycle, 7) visiting her husband's parents three times per week, and 8) shopping in the mall. (Tr. 37, 40).[7] The high volume of activity plainly contradicts Plaintiff's alleged inability to leave her house.

Accordingly, the Court finds that the ALJ did not err by considering Plaintiff's substantial delay in seeking treatment, her repeated failure to follow treatment advice, and her consistent failure to attend treatment appointments as reasons for discrediting Plaintiff's testimony. These reasons provide specific, clear and convincing evidence for

---

and are entitled to some deference as long as they are consistent with the Social Security Act and regulations.'" *Id.* (quoting *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006)).

[7] The Court also notes that by attending the first six of eight appointments at Marley House, Plaintiff has the ability to timely attend and function at treatment sessions. Plaintiff's ability to attend treatment is further evidenced by the fact that Plaintiff presented to her primary care facility nearly a dozen times within the course of eleven months, including four times within a span of seventeen days, for treatment related to physical injuries. (Tr. 372–93). In addition, Plaintiff explained to Dr. Van Eerd that she attends "regular meetings on a weekly basis." (Tr. 342).

1   the ALJ to reject Plaintiff's subjective testimony regarding the severity of her symptoms.

2   *See Lingenfelter*, 504 F.3d at 1036.

3            **b.      Plaintiff's Daily Activities**

4         Plaintiff also challenges the ALJ's decision that Plaintiff's daily activities

5   undermined her subjective complaints. (Doc. 19 at 8). Namely, Plaintiff argues that the

6   ALJ erred by considering activities of daily living that were not transferrable to a work

7   setting. (*Id.*)

8         The ALJ is not "required to believe every allegation of disabling pain, or else

9   disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C.

10  § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). In evaluating the

11  claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation,"

12  *Smolen*, 80 F.3d at 1284, and may "consider inconsistencies either in the claimant's

13  testimony or between the testimony and the claimant's conduct, unexplained or

14  inadequately explained failure to seek treatment or to follow a prescribed course of

15  treatment, and whether the claimant engages in daily activities inconsistent with the

16  alleged symptoms." *Molina*, 674 F.3d at 1112 (citations omitted). While a claimant need

17  not "vegetate in a dark room" in order to be eligible for benefits, *Cooper v. Bowen*, 815

18  F.2d 557, 561 (9th Cir. 1987) (quotation omitted), the ALJ may discredit a claimant's

19  testimony when the claimant reports participation in everyday activities indicating

20  capacities that are transferable to a work setting. *See Morgan v. Comm'r Soc. Sec.

21  Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *Fair*, 885 F.2d at 603. Moreover, "[e]ven

22  where those activities suggest some difficulty functioning, they may be grounds for

23  discrediting the claimant's testimony to the extent that they contradict claims of a totally

24  debilitating impairment." *Molina*, 674 F.3d at 1112 (citing *Turner*, 613 F.3d at 1225;

25  *Valentine*, 574 F.3d at 693).

26        Here, the ALJ explained that Plaintiff's allegations of disabling mental

27  impairments were undermined by her ability to 1) attend church "regularly," 2) use public

28  transportation to run errands, 3) walk and care for her dogs on a daily basis, 4) engage in

mall outings, 5) grocery shop, 6) ride her bicycle, 7) perform household chores, 8) cook simple meals, 9) provide care for her husband, 10) clean the house, and 11) develop coping strategies to deal with her occasional symptomology. (Tr. 40). Plaintiff's engagement in these pursuits reveals that Plaintiff has the ability to interact appropriately on a social level, function in public settings, cope with her symptoms, and concentrate for sustained periods of time. Although Plaintiff's testimony was somewhat equivocal about how well she could keep up with her activities without the help of her husband, and the ALJ's interpretation of her testimony might not be the only reasonable interpretation, it is still a reasonable interpretation that is supported by substantial evidence. *See Rollins*, 261 F.3d at 857; *see also Matthews v. Shalala*, 10 F.3d 678, 679–80 (9th Cir. 1993) (upholding ALJ's rejection of claimant's subjective complaints where ALJ found that claimant's performance of daily activities like housecleaning, light gardening, and shopping undermined claimant's assertion of disabling pain).[8]

### c.   Conclusion

Based on the foregoing, the ALJ's negative credibility finding was a reasonable interpretation of the evidence. The ALJ made specific findings supported by the record that provided clear and convincing reasons to explain her credibility evaluation.[9] Consequently, "it is not [the Court's] role to second-guess it." *Rollins*, 261 F.3d at 857 (citing *Fair*, 885 F.2d at 604).

---

[8] The Court finds that *Vertigan v. Halter*, 260 F.3d 1044 (9th Cir. 2001) is inapplicable to Plaintiff's claims. In particular, the *Vertigan* court remarked that the claimant's "constant quest for medical treatment and pain relief" refuted the ALJ's finding that the claimant's ability to grocery shop, walk an hour in the malls, get together with friends, play cards, swim, watch television, and read undermined her testimony of disabling physical pain. Here, Plaintiff never embarked upon a "constant quest" for clinical treatment. In fact, all evidence in the record points to a contrary conclusion.

[9] The Court notes that the ALJ also discredited Plaintiff's testimony for several other reasons, including Plaintiff's inconsistent statements regarding her medication usage, alcohol consumption, and familial relationships. (Tr. 40). While Plaintiff does not challenge the ALJ's findings in this regard, these reasons provide additional support for the ALJ's decision to discredit Plaintiff's symptom testimony.

**B.      Whether the ALJ Properly Assigned Plaintiff's RFC**

The Court next turns to Plaintiff's argument that the ALJ erred when she assigned Plaintiff an RFC without physical limitations but with a mental limitation of "simple work." (Doc. 19 at 4). Plaintiff highlights two portions of the ALJ's decision to support her argument. First, Plaintiff asserts that the ALJ erred by not incorporating into the RFC all of the limitations identified by consultative examiner Dr. Van Eerd. (*Id.* at 5). Second, Plaintiff claims that the ALJ erred by failing to follow the "function-by-function assessment required by SSR 85-15." (*Id.*)

**1.      Dr. Van Eerd's Opinions**

Plaintiff argues that the ALJ erred when she did not adopt all of consultative examiner Dr. Van Eerd's opinions. (*Id.*) Specifically, Plaintiff disputes the ALJ's decision to reject Dr. Van Eerd's opinions that Plaintiff had moderate to severe limitations in sustaining routine, an avoidant approach to social interaction, a poor ability to manage stress, a dependent approach requiring considerable support to meet basic requirements, and a poor ability to interact with coworkers and supervisors. (*Id.*)

The Ninth Circuit distinguishes between the opinions of three types of physicians: 1) those who treat the claimant ("treating physicians"); 2) those who examine but do not treat the claimant ("examining physicians"); and 3) those who neither examine nor treat the claimant ("non-examining physicians"). *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995). As a general rule, the opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician, but less than a treating physician. *Gallant*, 753 F.2d at 1454. In order to reject the un-contradicted opinion of an examining physician, the Commissioner must provide "clear and convincing" reasons. *Id.* Notably, even if contradicted by another doctor, the opinion of an examining doctor can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews*, 53 F.3d at 1043.

In this case, the ALJ concluded that Dr. Van Eerd "overstated" Plaintiff's mental limitations because his opinions were internally inconsistent with his own examination

findings. (Tr. 41). The ALJ specifically noted that during Dr. Van Eerd's examination, Plaintiff achieved a perfect score on a cognition test. (Tr. 41). The ALJ also observed that Dr. Van Eerd's examination findings were the sole source of his opinions because he examined Plaintiff on only one occasion and reviewed few, if any, of Plaintiff's mental health records. (*Id.*) Consequently, the ALJ remarked that due to the limited nature of the evaluation, Dr. Van Eerd was unable to accurately consider the longitudinal perspective of Plaintiff's impairments. (*Id.*)[10] Finally, regarding Plaintiff's concentration, persistence, and pace, the ALJ found that Dr. Van Eerd "overestimate[d]" Plaintiff's limitations due to her "educational background and reported continued daily activities including reading, doing crossword puzzles, and watching television, all of which would require some amount of sustained concentration." (Tr. 37).

The Court finds that the stark discrepancy between Dr. Van Eerd's own examination findings and opinions constitutes a "specific and legitimate reason" to reject his opinions that were unsupported by his clinical findings. *See Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The ALJ need not accept an opinion of a physician—even a treating physician—if it is conclusionary and brief and is unsupported by clinical findings." (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989))). For example, Dr. Van Eerd's opinions that Plaintiff had an avoidant approach to social interaction and a poor ability to interact with coworkers and supervisors directly contradicted his findings that Plaintiff had good social awareness and social judgment, was "polite" and "respectful" during the interview, and had "fair" one-

---

[10] Dr. Van Eerd also observed in his clinical findings that Plaintiff 1) presented with "good basic work decision making ability"; 2) had fair "one-on-one behavior and cognitive ability"; 3) had an adequate ability to manage critique and follow work rules; 4) had "very good" intellectual functioning and general memory; 5) was "polite" and "respectful" during the interview; 6) had good "persistence to task"; 7) correctly completed a mental math problem and phonics tests; 8) had "good effort and motivation"; 9) was "oriented as to time, place, person, and situation"; 10) was able to recall three of three items after three minutes; and 11) had good social awareness and judgment. (Tr. 341–44).

on-one behavior. (Tr. 342–45). Dr. Van Eerd's opinion that Plaintiff had a moderate to severe limitation in sustaining routine was undermined by his finding that Plaintiff had "good" persistence to task, "good" effort and motivation, and an "adequate" ability to follow work rules. (*Id.*) Finally, his opinion that Plaintiff required considerable support to meet even basic everyday needs contradicted his findings that Plaintiff possessed "very good" intellectual functioning and an adequate ability to manage critique and follow work rules. (*Id.*)

The Court concludes that due to the inconsistencies between Dr. Van Eerd's clinical findings and opinions, coupled with the fact that he only examined Plaintiff on one occasion, substantial evidence existed for the ALJ to determine that Dr. Van Eerd "overstated" the severity of Plaintiff's mental limitations. *See Andrews*, 53 F.3d at 1043; *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's decision must be upheld."). Consequently, the ALJ did not err by not incorporating all of Dr. Van Eerd's opinions in Plaintiff's RFC.

### 2.   SSR 85-15

Plaintiff also argues that the ALJ erred by failing to follow the "function-by-function assessment required by SSR 85-15." (Doc. 19 at 4–5). Specifically, Plaintiff claims that a mental RFC of "simple work" is "ill-defined" and "inadequate" because it is an "objective skill-level classification" not "unique" to Plaintiff's circumstances. (*Id.*)[11]

SSR 85-15 governs the evaluation of whether a claimant with only non-exertional impairments is capable of work. SSR 85-15, 1985 WL 56857 (Jan. 1, 1985). The Ruling articulates that a person's "response to the demands of work is highly individualized." *Id.* Because of this, "the skill level of a position is not necessarily related to the difficulty an

---

[11] As to Plaintiff's exertional limitations, the ALJ correctly determined that the objective evidence portrayed Plaintiff engaging in an active lifestyle with no exertional prohibitions—a view confirmed by internist Keith Cunningham, M.D., and state agency consultant Paul Schenk, M.D. *See* (Tr. 81, 306–10). Consequently, the RFC properly reflects, and Plaintiff does not dispute, Plaintiff's lack of exertional limitations.

individual will have in meeting the demands of the job." *Id.* Accordingly, "[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment." *Id.*

The Court finds that the ALJ adequately applied SSR 85-15. The ALJ methodically reviewed Plaintiff's alleged symptoms and the extent to which they were consistent with the objective medical evidence, longitudinal medical history, clinical findings, observations of Plaintiff's treating and examining physicians, and lay opinions of Plaintiff's parents and husband. (Tr. 38–41). After review of this evidence, the ALJ concluded that the assessed RFC was "well-supported by greater weight of the entire evidence of record, including the opinion evidence . . . as well as the limited treatment records in evidence. Moreover, the claimant's diminished credibility does little to corroborate her allegations in this matter, mandating that the objective and opinion evidence of record in this matter be given great weight." (*Id.*)

The Court has already found that the ALJ properly discredited Plaintiff's subjective symptom testimony. The Court also concluded that the ALJ appropriately dismissed Dr. Van Eerd's opinions that did not correlate with his objective examination findings. In addition, the ALJ properly discounted Plaintiff's family member's opinions because they were inconsistent with the objective medical evidence of record, were likely biased due to the close relationship with Plaintiff, and Plaintiff's parents lived out of state and had minimal day-to-day contact with Plaintiff. *See Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984) (holding an ALJ may discount lay testimony that conflicts with medical evidence).

In terms of clinical findings, the ALJ considered and incorporated the objective findings of Dr. Van Eerd's mental examination, which showed that Plaintiff had strong cognitive recall and memory, coupled with an ability to appropriately interact with others on a social level. (Tr. 37, 41, 341–44). The ALJ also accounted for Plaintiff's psychiatric evaluation with JFCS, which indicated that Plaintiff was casually dressed and groomed appropriately; had no mental abnormalities; and possessed good memory, insight, and

judgment. (Tr. 40, 314). By limiting Plaintiff's mental RFC to "simple work," the ALJ also considered the clinical findings that showed Plaintiff experiences periodic mental limitations. *See Frost v. Barnhart*, 314 F.3d 359, 361 (9th Cir. 2002) (upholding ALJ's decision that medical evidence supported an RFC determination of "simple work").

Accordingly, the ALJ did not err in formulating Plaintiff's RFC because the "simple work" mental limitation "took into account those limitations for which there was record support that did not depend on [Plaintiff's] subjective complaints." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

### C. Whether the ALJ Properly Relied on the Medical Vocational Guidelines to Support Her Finding that Plaintiff Could Perform Substantial Gainful Work Existing in the National Economy

Plaintiff's final contention is that the ALJ erred at the fifth step of the sequential evaluation process by relying on the Medical Vocational Guidelines ("Grids") rather than consulting a VE to determine whether Plaintiff could perform work existing in the national economy. (Doc. 19 at 5–7). Plaintiff provides two general reasons to support her argument. First, Plaintiff asserts that because the Grids do not adequately and accurately represent her non-exertional limitations, the ALJ erred by applying them rather than consulting a VE. (*Id.* at 6). Second, Plaintiff contends that the ALJ failed to support her finding that Plaintiff could perform work existing in significant numbers in the national economy. (*Id.* at 6–7).

### 1. Whether the Grids Adequately and Accurately Represent Plaintiff's Non-Exertional Limitations

At step five in the sequential process, the ALJ considers whether a claimant can perform work that exists in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). The ALJ can make this determination by using either "the testimony of a vocational expert or by reference to the Medical Vocational Guidelines." *Thomas*, 278 F.3d at 955. The Grids "consist of a matrix of [claimant's RFC, age, work experience and education] and set forth rules that identify whether jobs requiring a specific combination of these factors

exist in significant numbers in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461–62 (1983); *see* 20 C.F.R. §§ 404.1569, 404.1569a, 416.969, 416.969a.

"The [Social Security Administration's] need for efficiency justifies use of the grids at step five where they completely and accurately represent a claimant's limitations." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999) (citation omitted). The Grids should not be used, however, if they "fail to accurately describe a claimant's particular limitations." *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985). On the other hand, an alleged non-exertional limitation "does not automatically preclude application of the grids. The ALJ should first determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations." *Tackett*, 180 F.3d at 1102. "A vocational expert is required only when there are significant and 'sufficiently severe' non-exertional limitations not accounted for in the grid." *Hoopai v. Astrue*, 499 F.3d 1071, 1075–76 (9th Cir. 2007).

SSR 85-15 provides guidance for applying the Grids to cases involving claimants with only non-exertional limitations. According to the Ruling,

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. . . .

> . . . .

> Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.

1    SSR 85-15. The Code of Federal Regulations further describes "unskilled" work as
2    "work that needs little or no judgment to do simple duties that can be learned on the job
3    in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a).

4            Here, the ALJ concluded that Plaintiff's mental limitation to simple work would
5    not significantly affect the range of unskilled work she was able to perform at all levels of
6    exertion. (Tr. 42). The Court finds that substantial evidence supports this conclusion.

7            Initially, there was substantial evidence for the ALJ to find that Plaintiff could
8    perform unskilled work as defined in the Code of Federal Regulations and SSR 85-15.
9    The ALJ noted that Plaintiff presented to JCFS with no mental abnormalities but with
10   "good" judgment, impulse control, and insight. (Tr. 40). The ALJ also referenced Dr.
11   Van Eerd's examination findings (Tr. 41), which indicated that Plaintiff was "very good"
12   with "[i]ntellectual functioning and general memory," had "fair" cognitive capacity, and
13   possessed "good effort and motivation" (Tr. 344). Dr. Van Eerd also opined that Plaintiff
14   possessed "good basic work decision-making ability," her approach to authority was
15   "respectful," her "persistence to task was also good," and she had "good" social
16   awareness and social judgment. (Tr. 344–45).[12]

17           Applying these attributes to the demands of unskilled work, Plaintiff's "very
18   good" intellectual functioning, "good" insight, and "fair" cognitive capacity enable her to
19   understand simple instructions and deal with changes in a routine work setting. Her "very
20   good" general memory allows her to remember simple instructions, while her "good"
21   persistence to task empowers her to carry them out. Finally, Plaintiff's "respectful"
22   approach to authority, "good" impulse control, "good basic work decision making
23   ability," and "good" social awareness and social judgment permit her to respond
24   appropriately to supervision, coworkers, and usual work situations.

25           Of course, Plaintiff must be able to perform unskilled work "on a sustained basis."

26   _____

27   [12] While Dr. Van Eerd also opined that Plaintiff experienced more restrictive
28   limitations, the ALJ properly rejected these opinions due to their inconsistency with the
     doctor's own examination findings as discussed above.

*See* SSR 85-15. In this regard, the ALJ found that Plaintiff had only moderate limitations in concentration, persistence, and pace due to her extensive educational background; lengthy career as a proficient, self-reliant employee; and daily activities that include reading, watching television, and doing crossword puzzles. (Tr. 37). The ALJ also observed that when Plaintiff actually attended a treatment session, she was able to stay for the entire appointment. (Tr. 40). The ALJ reasonably interpreted this evidence to show that Plaintiff had the ability to meet the demands of unskilled work on a sustained basis. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174–76 (9th Cir. 2008) (holding that an RFC finding for unskilled work is consistent with finding that a claimant had moderate limitations in persistence, pace, and concentration).

Finally, as readily seen from the Code of Federal Regulations and SSR 85-15 definitions of "unskilled" work, Plaintiff's mental limitation to "simple" work had little or no effect on her occupational base at all exertional levels. The definitions already limit the occupational base of unskilled work to "simple" duties and instructions. Thus, by limiting Plaintiff occupational base to "simple work," the range of available jobs was not significantly decreased.

In short, the ALJ's decision to apply the Grids in lieu of posing hypotheticals to a VE was not error. "Considering the other reasons given by the ALJ for [Plaintiff]'s lack of credibility and [her] RFC, and in the face of the substantial evidence relied on by the ALJ, [Plaintiff] has not persuaded [the Court] that the ALJ overlooked any non-exertional impairments 'significant enough to limit the range of work permitted by exertional limitations' so as to preclude application of the grids.'" *Haynes v. Colvin*, __ F. App'x __, 2015 WL 3620679, at *2 (9th Cir. 2015) (quoting *Lounsbury v. Barnhart*, 468 F.3d 1111, 1115 n.2 (9th Cir. 2006)).

### 2.   Whether the ALJ Adequately Supported Her Finding that Significant Numbers of Jobs Exist in the National Economy

Plaintiff also asserts that the ALJ failed to support her finding that Plaintiff could perform significant numbers of jobs existing in the national economy. (Doc. 19 at 6–7).

Specifically, Plaintiff contends that the ALJ erred when she did not "list in the written decision any other jobs that existed in the national economy that would be suitable for claimant." (*Id.* at 6). Plaintiff argues that the occupational base available to her would be "substantially reduce[d]" due to her limitations as evidenced by her medical records and symptom testimony. (*Id.* at 7).

The Supreme Court of the United States has long held that an ALJ's reliance on the Grids alone is a valid basis for denying a claim for benefits when the Grids accurately describe the claimant's abilities and limitations. *Campbell*, 461 U.S. at 468, 470. As discussed, the Court finds that the ALJ properly concluded that the Grids accurately reflect Plaintiff's abilities and limitations. The ALJ, therefore, did not err when she relied solely on the Grids to deny Plaintiff's claim without enumerating specific jobs that exist in the national economy. *See id.*

**IV.   Conclusion**

For the reasons stated above,

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is affirmed. The Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 28th day of October, 2015.

James A. Teilborg
Senior United States District Judge